Next case for argument this morning is Puget Sound Keeper Alliance v. Port of Tacoma Puget Sound Keeper Alliance v. Port of Tacoma Clare Tonry Good morning and may it please the Court. I'm Clare Tonry and along with Alyssa Kefjian, I represent Puget Sound Keeper Alliance. I'll attempt to reserve five minutes for rebuttal and watch the clock. The decisions that Sound Keeper appeals from are not just unprecedented in its 30-plus years of successful Clean Water Act enforcement. They're fundamentally contrary to court precedent and to Congress's intent, which was to enact a straightforward regulatory regime and empower citizens to enforce it in cases such as this where there are ongoing illegal discharges of toxic pollution to our waterways. I'll focus on three major issues today. First, Sound Keeper gave appropriate pre-suit notice and the trial court made an egregious error of law when it ordered Sound Keeper to pay over $84,000 of SSA's attorney's fees for following the trial court's own prior order on notice letters. Second, as repeatedly confirmed by the state agency that wrote the permit in this case, the Washington Industrial Stormwater General Permit regulates the entire footprint of defendants' transportation facility, including the untreated pollution from its wharf. And third, the port and SSA were not entitled to summary judgment because their permit violations are ongoing. So beginning with the pre-suit notice letter issue, this case involves multiple 60-day notice of intent to sue letters that are in some respects anticipatory, as all notice letters necessarily are. But none of the notice letters in this case are entirely anticipatory, and that's because this port facility has been violating the Clean Water Act and the Industrial Stormwater Permit since long before Sound Keeper filed suit and long before it sent its first notice letter. Initially, in the district court's first notice letter decision, it approved of Sound Keeper's anticipatory notice letter to the port. That letter was anticipatory in that it alleged that if the port obtained a general permit coverage in its own name, it would be in violation of that permit. And the first decision that approved of that anticipatory notice is consistent with the weight of case law, and that includes the Citizens for a Better Environment v. Union Oil case, which held that issuing notice before a Clean Water Act limit comes into effect actually furthers the purposes of the notice requirement because it provides an opportunity to avoid the violation altogether. It's also consistent with this court's decision in NRDC v. Southwest Marine, which held that a violation that only arose after the notice letter didn't require a subsequent additional notice letter. The district court's first decision is also consistent with the First Circuit's decision in Waterkeeper Alliance v. Department of Defense, which held that a notice letter issued in May supported a challenge to an action that actually occurred several months later. It's also consistent with the decision in Cascadia Wildlands v. Scott Timber, which approved of a notice letter that asserted that any future logging in a specified area would be subject to a citizenship. So in short, nothing precludes anticipatory notice, and in fact, there are numerous cases expressly approving of such notice letters. And so with that backdrop, I'll now turn to SoundKeeper's 2017 notice letter to SSA, which was a very similar notice letter to the notice letter to the Port, which the district court upheld. This notice letter informed SSA that the facility was already in ongoing violation of the permit, and that if SSA began industrial operations at the facility before those pollution problems were solved, it too would be in violation of the general permit. And in this manner, the notice letter fulfilled the purpose of the notice requirement by telling SSA what it needed to do to avoid a lawsuit. It simply needed to refrain from conducting industrial activity on that site until those ongoing pollution violations were resolved. But instead of doing that, SSA began operating at the site knowing that pollution treatment would not be installed for a year or more. And instead of worrying about coming into compliance, SSA got the Port to indemnify it and cover any expense of the anticipated Clean Water Act citizen suit. So this case is somewhat like the Waterkeeper case from the First Circuit, where the notice letter alleged an ongoing deficiency, and rather than avert the anticipated violation, the recipient of the notice letter went forward knowingly with the violation. Do I understand your position that you don't actually need us to agree that the anticipatory notice was appropriate or correct? You just need to establish that it wasn't frivolous. Am I right about that? In order to avoid fees. In order to avoid fees, the standard is just frivolous. But we believe that it's meritorious on its own accord. And, you know, indeed, SSA was operating the polluting facility for nearly eight months before Soundkeeper filed its lawsuit. And still these violations were ongoing. And so that brings us to the trial court's second notice letter decision, which is contrary to the first decision and approving of anticipatory notice. It is also very contrary to the actual facts in the case. Specifically, the district court held that that notice letter was inappropriate only because Soundkeeper theoretically might have sued SSA on the first day it began operating at the site. And if Soundkeeper had done that, then SSA would not have had at least 60 days to make hands-on physical changes itself. But, again, SSA did have physical control over the facility for well over 60 days, nearly eight months, in fact, before Soundkeeper filed its suit. May I ask you to address what I think you said was going to be your second issue, which is about the scope of the permit? So if we agree with you that the permit, by its terms, covers the discharges from the wharf area, how is that consistent with 122.26A9, the regulation that seems to say that you can't regulate those kinds of discharges unless there's been some determination, which I don't think the state has made? So the state has made the determination. I think you're referring to the residual designation authority. But let's back up a minute. First, it's well established that citizens can enforce all NPDES permit conditions, including those that are more stringent than the federal requirements. That's established by this court's decision in Northwest Environmental Advocates v. City of Portland and CARE v. Henry Bosma Dairy, among others. And is that true if they're – I mean, suppose you have a permit condition that's just totally unrelated to the federal statute, like the state says, you know, as a condition of the permit, you must plant a tree at the grounds of the state capitol once a year. If they don't plant a tree, can that be a basis for a citizen suit? The case law fully incorporates all of the terms of an NPDES permit into the federal law. And that's at 40 CFR 122.41, which states that any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action. The argument that I think the defendants have made with regard to the scope arises under different statutes. It's never been applied in the NPDES program context for the reasons that I just explained, that all permit provisions are enforceable under the federal law. And, in fact, the permit says so. So the answer in the hypothetical, I take it then, would be yes, right? If the state, for whatever reason, puts something like that in the permit, you could have a citizen suit to enforce it, right? It would be. And I want to address another aspect of this. Before you leave it, I'm still stuck on the state not having made a stormwater determination. Isn't that a problem for your – It's not, Your Honor. Why? So the state did make that determination. The dispute we have here is whether there are procedural requirements that the state must fulfill in making that determination. And there are none. The requirement is that the state make a determination. The state did that as part of its issuing its permit. That permit is subject to notice and comment. It's subject to appeal. And it's also subject to EPA approval, which was given here. So all of the procedural requirements for issuing a valid NPDES permit, which all of its terms can be enforced, have been fulfilled. And defendants identified no other procedural requirements in the law. There are none. And so just – can you elaborate on that a little bit? So I guess your view is if they – if they, the – they being the court – thought that the terms of the permit were too broad, they should have challenged it at some earlier stage or – how would they have gone about challenging the – what the permit required? Yes. There is a provision of state law. It's required by federal law. There's an opportunity to challenge the permit, to appeal the permit. And then they do that in state court or how do they – There's a state administrative proceeding. Okay. Yes. But I also want to point out that in these other statutory contexts, aside from the NPDES permit program, where courts have addressed something being beyond – purportedly beyond the scope, the courts have held that additional state requirements are only beyond the scope where they increase the population of regulated entities. And the regulation of the wharf at this facility does not expand the population of regulated facilities. It's uncontested. This facility would require permit coverage under federal law as well because it has equipment cleaning and vehicle maintenance activities. And is it – I mean, I'm still trying to understand the – I know you started by saying, you know, the case law interpreting 1365 says that, you know, you can have a citizen suit to enforce any condition of a permit. In such a citizen suit, can the permittee raise as a defense an argument that a permit condition is not valid? Or do you think that a collateral attack is impermissible? I think the case law is very consistent, Your Honor, that the collateral attack on the permit is improper and that the regulated entity's opportunity is to – is with the state agency. It's to appeal the permit. And what case do you think most clearly says that? That prohibits collateral attacks on the permit. I have that in front of me, Your Honor, but I do believe it's cited in the briefs. There have been numerous cases. One that comes to mind is Waste Action Project versus Astro Auto from the Western District of Washington. And so I do want to just briefly mention that the plain language of the permit does, in fact, regulate all areas of this transportation facility. The 2015 iteration of the general permit is where we'll start because that's what the district court ruled upon. The permit conditions apply to any facility in which the permit defines the term facility as any source, including land or appurtenances thereto, that is subject to regulation under this permit. And then it refers us to condition S-1 of the permit. Counsel, I'm a little confused by the number of permits we're talking about. There was a permit prior to the permit that the Port of Tacoma now has, or at least in terms this litigation has. Does the new permit incorporate all of the provisions of the old permit? The point being that you can only sue on the permit. So which permit are we suing on? That's right. This case does span three iterations of the general permit, the 2010, 2015, and 2020 permits. All of the provisions at issue are the same, and the scope of regulation is the same. But did the prior permit liability get transferred to the port? That's a little bit of a different issue, but I understand. So the district court recognized that the permit conditions in the port's prior tenant's permit are identical. It's the identical permit. It's the 2015 general permit that the port then took on as the named permittee. So it's undisputed that the violations of that 2015 permit were ongoing at the time Soundkeeper filed suit against the port. The district court, though, dismissed the claims against the port for violations of that permit only because during the notice period the port's tenant terminated its general permit, but that very same day the port obtained coverage for the same facility under the same permit, just in the port's name rather than its tenant's name. And so with respect to the port, this is a purely administrative change which doesn't cure that ongoing violation, which is the issue. And as this court held in Ecological Rights Foundation v. Pacific Lumber, there is no basis for believing that the bare fact of a new permit makes future permit violations any less likely. And indeed, we have to think about the policy here. If polluters can evade liability just by getting a new copy of a general permit with a different number but otherwise identical, the Clean Water Act becomes a dead letter, not just for the thousand. But it is a different entity. The new permit was issued to the Port of Tacoma, but the old permit was issued to the prior SSA, was it not? The old permit was issued to the tenant APM. The port has been the landowner and the landlord for this facility throughout that entire time, throughout changes in tenants. And the liability under the citizen supervision is not limited to the named permittee. Rather, any person can be liable. And the port is alleged and, in fact, does have sufficient control over the facility to be held liable under the APM's permit. And so the mere changeover of the name on the permit, again, the identical permit, the identical terms, is not sufficient to terminate the port's liability for those ongoing violations. And I see that I'm running into my rebuttal time, so I'll reserve unless there's other questions. Actually, we'll make sure you get enough time for rebuttal. But can I just ask, the district court thought that you had not created a genuine dispute of material fact on SSA's violation of the water quality standard because your expert just said that the discharges had the potential to cause violations, and the district court thought that wasn't enough. Why was that wrong? That was wrong because what our expert actually testified was that, quote, SSA's stormwater discharges have contributed to the elevated sediment metal concentrations that landed the receiving waters on the official list of waters that violate sediment quality standards. So, in other words, Soundkeeper's expert gave the exact testimony that the district court said would be sufficient to create a material issue of disputed fact. And, in fact, another judge in the Western District of Washington held that this exact type of testimony was sufficient for Soundkeeper to be granted summary judgment. So I think that the district court just overlooked this testimony about the violations of sediment quality standards, and that's the key. And that the sediment quality standards then flow into the water quality standards. That's exactly right. There are species of water quality standards. Thank you, and we'll give you four minutes for rebuttal. Mr. Dahl. Thank you. May I please court? I am Brad Dahl. I'm appearing on behalf of the Port of Tacoma. With me here today at council's table is Brad Jones, representing the SSA entities, which, for the sake of brevity, I'll refer to today as SSA. The words of the permit matter, and the words of the Clean Water Act matter. It is those words which inform the regulated community, including the Port of Tacoma and SSA, how to comply with the permit. And we have to hold those words to PSA as well, because the Clean Water Act requires notice to the alleged violator of the alleged violations. This is present tense language. It doesn't allow for hypotheticals, for speculation, about what a permit might be in the future, what conditions might exist in the future. And when we hold true to these words, we resolve all the issues in this case, and we ensure that cases like this one that meander their way for years through the district court and consume hundreds of hours of time do something more than this one, which is to say a plaintiff who fails to meet the burden of proof on even a single violation of the Clean Water Act. I'm going to address three points today. First, I'll address the permit's scope of coverage, the district court properly granted summary judgment finding that the permit did not apply to the activities on West Sycombe Terminal Wharf. Secondly, I'll address the district court's other findings on summary judgment, the other contentions of violations of the permit. And third, I'll address the district court's ruling properly granting the motion to dismiss to SSA on anticipatory notice violations, and the district court need only have applied that same logic to the port and would have granted the port's motion as well. So turning to the first question, that is to say the scope of the permit's coverage, this court in County of Los Angeles stated that when the permit language construed in light of the permit structure as a whole is plain and capable of legal construction, that language alone determines the permit's meaning. Now applying that standard, both the Pollution Control Hearings Board, the entity that oversees development of ecology permits, and the district court below on voluminous records, including amicus briefs, deposition testimony, and more reached the same conclusion, that the language of the permit incorporated EPA's specific exclusionary definition of discharge associated with industrial activity. So what do we do with the – I mean, the language of the permit says, you know, this permit applies to facilities conducting industrial activities that discharge stormwater, et cetera. And the regulation that I think you're referring to has that provision, you know, only those portions of the facilities. Yes. But that language is not in the permit. The permit just says it applies to facilities conducting the activities. So why, you know, on its face, why doesn't that mean it covers the facility? Yes. Well, I would submit, Your Honor, that language is in the permit. As the district court found and as the Pollution Control Hearings Board found, that language is expressly incorporated in the definition of industrial activity in the permit's definition section. So Table 1, which identifies who has to apply for coverage – Table 1 describes who has to apply for coverage. Inside the permit, we see what conditions apply based off of industrial activity, the definition that I just mentioned. That is how we know where the permit applies on any given facility. So EPA's express definition is incorporated into the permit. They are inextricably linked, as both the board and the district court found. And that definition, as Judge Miller recognized, is exclusionary. It specifies precisely what activities are considered to be associated with industrial activity, none of which were occurring on the Wessex Terminal Wharf. Soundkeeper's argument here would have this court divert from its longstanding precedent from County of Los Angeles and have the court treat as surplusage ecology's incorporation of that express, exclusionary language in the definition of industrial activity. And I'm sorry, so I'm looking at – I guess it's the 2015 permit on page 972. Where is the express incorporation of the limiting language that you're referring to? Yes, Your Honor. So the way the permit is set out, it has a number of conditions – S-1 through, I believe, S-11, perhaps. Then it has a definition section immediately following where the term industrial activity is described. And in the definition of industrial activity, ecologies described that activity as the activities identified in 40 CFR 122.26B14 sub I through XI, which is the entirety of EPA's definition. Are you looking at page 54, which is the definition provision? I'm looking at the permit dated 2015 expiring in 2019. Is that the permit we're talking about? So, yes, Your Honor. All right, let's see. In the record, it is ER – it is page 1026. The page number in the ISGP is obscured for me. But, yes, industrial activity means parentheses 1, the 10 categories of industrial activities identified in 40 CFR 122.26B14, I through XI – or I through IX and XI. And that excludes the WRF? Is that what you're telling us? Yes, Your Honor. Thank you. Why? Well, because that definition, when it comes – when you walk through EPA's regulations, when you get to the section that applies to the SIC code that describes the activities being conducted by the ports tenant, sets out the definition of discharge associated with industrial activity  That definition provides that only those portions of the facility engaged in vehicle maintenance, equipment cleaning, or airport de-icing, or which are otherwise identified by EPA in the remaining sections of that regulation are deemed to be associated with industrial activity. And that's all on page 1026 that you see of the ER? That's right. Thank you. But I guess I'm not – I'm still not totally sure how that helps you because it seems like what you need is a – not a definition of industrial activity. You need a definition of facility, right? Because the permit says any facility conducting industrial activity. And within the facility writ large, that industrial activity is occurring. So the question is, does facility mean the whole facility or just the portion of the facility where the industrial activity is going on? And I don't see the restrictive language that it's just the portion reflected in the permit. All right. So I appreciate this question. The definition of facility in the permit is circular. What it says is the facility is those activities subject to this permit. So that doesn't tell you anything about what the permit actually requires. The way the permit structure is set out in Condition S-1A, it identifies who has to apply for coverage. So if you are conducting activities listed in Table 1, you must apply for coverage. But the scope of the activities, the area – the physical area that you have to apply the permit's conditions to is driven by the permit incorporating the definition of industrial activity. So, for example, it will say, you have to prepare a stormwater pollution prevention plan for those areas that are engaged in industrial activity, industrial activity being the defined term. In the permit, this is indicated by parentheses used on that term. So then you go to the definition of industrial activity in the back of the permit, and that's where you see the incorporation of EPA's express exclusionary language. And I want to pick up on another point that you made, which was quite correct. There is an issue here. As the port moved, it's not just that the permit doesn't apply to the activities that are conducted on the terminal wharf. It's also that even if they did, ecology never went through the steps necessary to expand the state program to make it enforceable under the Clean Water Act. Now, council must have misspoke. Council suggested that EPA had approved the scope of the 2015 permit as being broader than the state program or broader than what the NPDES program would normally require. There's nothing in the record to that effect. EPA was never informed, just as the public was never informed, about a change in the permit scope. Council must have also misspoke when saying that there is case law providing that the EPA regulation 40 CFR 123.1 sub I-2, which is very clear in providing that states who are trying to change the scope of the program cannot do so. It is not federally enforceable. Now, that provision, I'll say, is not just clear, but it applies here because if you look at how EPA has applied that language, you see that PSA's position on this is mistaken. For example, when EPA applies that provision to CAFOs, CAFOs are an entity that are regulated under the NPDES program. EPA provides that when a CAFO wants to land-apply waste, that is subject to the NPDES program, unless the CAFO follows EPA's procedures, in which instance, that area that is subject to land application of the nutrients from the CAFO are not subject to the NPDES program. In EPA's development of this, EPA was quite clear. If a state comes in and tries to implement the NPDES program on those lands, that's not federally enforceable. You may not expand the scope. So how do you reconcile that with the text of 1365, which refers to enforcing a permit or a permit condition, right? And, I mean, I think the other side's position is, you know, whether or not this is a permit condition. Again, this requires accepting the view, which I understand you don't, that the permit actually does cover this. But if the permit covers this, then, you know, whether or not it should under the statute, it clearly is a condition of the permit by hypothesis. So why under 1365 wouldn't that be enforceable? Right. Well, again, most importantly, the permit does exclude these activities. But to this point, when this court suggested that permit conditions are enforceable, it used a very important word, and this is in the City of Portland case. It said valid permit conditions, right? So that implies that the permit condition was adopted through the procedure set out by EPA and by the state, which is to say you provided a fact sheet in advance, you identified for the public what was going to be required and where, and you got EPA approval for any changes in the permit scope that would increase, that would alter this federal program. None of those things happened here. So I believe, you know, your friend on the other side's answer to that was if you thought the permit was invalid, you have an administrative process for challenging it, but you don't get to collaterally attack it here. What's your answer to that? Well, I suspect that we would have appealed it if there had been public notice of a change in the permit scope of – of its – change in the permit scope. As the record is before this court, when Ecology supposedly changed the permit scope in the 2010 iteration of the permit, Ecology started that process out with a fact sheet to the regulated community, which is supposed to inform the regulated community of its obligations. Nothing in the fact sheet says anything about a change of permit scope. In response to public comments, the same thing, no mention of a change in the permit scope. The permit writer sent two emails in 2009 while he was developing the permit, one to municipalities answering questions about water transportation facilities, exactly the activity being conducted here. The other he sent to his attorney and his boss, Bill Moore. Both emails say the same thing. The permit scope is exactly the same as EPA's regulations provide. So there's nothing in the record that's reliable, that's not, you know, the most reliable evidence in the record which is produced for the purpose of informing the regulated community about what a permit requires is consistent in this regard. So there's no opportunity for anyone to challenge the permit scope. I have eaten up all of my counsel's time. My apologies, but – my apologies to counsel, but – No, you started with only 15 minutes, so he still has five minutes left after you hit zero. Oh, well, thank you very much. Well, so in closing, I would ask that this court affirm the district court's rulings granting summary judgment and also find, if it reaches the issue, that the district court should have granted the court's motion to dismiss. And I will just say one quick thing since I have one minute left on that point. Soundkeeper's position on this asks this court to take a flexible, pragmatic point of view. Could you have figured out what we were talking about? That is not the standard under the 60-day notice requirements of the Clean Water Act. It could not be clearer. Notice must be provided to the alleged violator of the violations. And, again, this is present tense language. It doesn't envision speculating about what some future permit might require of you or what activities might constitute a violation down the road. And requiring anything less than that is an obstacle both to the recipient and to the agency, which is supposed to have enforcement authority, to identify quickly and respond to the allegations. Thank you. Thank you. Mr. Jones. Thank you. Plaintiff Puget Soundkeeper Reliance, PSA, should never have sued the port or SSA. By October 23rd of 2017, PSA had got everything it wanted and compliance with the Clean Water Act had been achieved. When Ecology issued the agreed order to the port to require the installation of a $12.7 million treatment system, at PSA's insistence, because when Ecology said, we're going to give a new permit to the port, PSA said, we're going to appeal that decision unless you accompany it with an agreed order requiring the installation of the treatment system. And that order became effective on October 23rd, 2017. There's been no proof of any violations of the Clean Water Act since that time. PSA claims there were ongoing violations. That's not accurate. Condition S8 of the permit is what requires the installation of the treatment system, and it provides a time period in which that must be performed. The port actually completed the treatment system ahead of the schedule in the permit, so there was no violation of the treatment requirement within the permit. PSA had achieved exactly what it had asked for. Under this court's reasoning and Marina Point, the purpose of the Clean Water Act had been achieved. As a practical matter, its litigation after that point was useless. What PSA should have done is declare victory, go home with the $382,000 attorney fee award it received from the undeniably bad actor APMT. What was a useless pursuit became frivolous when it tried to base a lawsuit on SSA Marine and SSA Terminals on a notice letter that met none of the standards and for which there was no legal support. Before I get to that, though, I want to address a couple of points that were raised earlier. With respect to whether ecology expanded the permit, the section that counsel referred to, 123.1 of the federal regulations, has two provisions. It says if a state makes more strict standards, for example, if EPA has a standard of 100 parts per million, and a state decides to make a more strict standard, 50 parts per million, that is federally enforceable. But the language of the second provision said, but if the scope of the permit is changed, that is not federally enforceable. A state may elect to do that, and the state regulatory body may be able to enforce that, but a citizen can't enforce it under the federal Clean Water Act. Now, the adequacy of a 60-day notice letter is measured at the time it is received by the supposed defendant. The controlling facts here are two. One, at the time that they sent the notice letter to SSA, it had no possessory interest, no control, no ability to control or to do anything at the terminal. Two, at the time it sent that letter, the regulators had absolutely no ability to force SSA to do anything. At that point, it was a stranger to the terminal. The Department of Ecology couldn't have issued an order. And that gets to Hellstrom and the purpose of the notice letter. PSA asks you to focus just on the regulation about the notice letter and the contents of the notice letter, but Hellstrom says we have to look to the underlying purpose of Congress in establishing this obligation, and those are twofold, to allow the appropriate governmental agency to have the first opportunity to enforce the act, and two, to give the alleged violator 60 days to come into compliance. Neither of those occurred here, and PSA never addresses those. PSA never addresses how the appropriate governmental agencies could have taken an enforcement action against SSA at the time of the notice letter, or how SSA could have been able to take any action to force the terminal into compliance. None of the cases cited by PSA involve a stranger to a site with no existing responsibility for a violation and no ability to cure them, and none of them involve a notice to a party against whom regulators are powerless to do anything. In every case they cite, either the party had an ability to do something at the time it received the letter, or the regulators had the ability to require them to do something. In Marina Point, this court established a second basis to look at the adequacy of the notice letter. In that case, the court applied the underlying purpose of the notice letter to the facts and found that where the regulators had stepped in and corrective action was underway, a suit was gratuitous. That is precisely the case here from October 23, 2017. Excuse me for it. Thank you, counsel. You're over your time. If you want to wrap up. SSA requests that this court affirm the district court's dismissal of SSA terminals and SSA terminals to comma, affirm the district court's decision granting attorney fees to SSA terminals, reverse the trial court's decision denying attorney's fees to SSA Marine,  SSA terminals to comma for the third phase of the case. Thank you. Ms. Tonry. Thank you, Your Honors. I want to return to the interpretation of the permit and the enforceability of it, and I do want to point out that Your Honor has it exactly right, that the exclusionary language from the CFR is not in the permit. Moreover, Soundkeeper is not reading anything out of the permit. I think it's exactly the opposite. My opposing counsel wants us to focus on the definition of industrial activity in the permit, but they're reading out the second and third provisions of that definition. The first provision refers to the CFR. The second provision, which stands alone, defines industrial activity to also mean any facility conducting any activities described in Table 1 of the permit. Table 1 of the permit, again, lists transportation facilities that have vehicle maintenance or equipment cleaning operations anywhere on the site, and so we just return back to that broader definition of facility within the permit. Second, I do want to make the correction that EPA, in fact, did review this permit. That's at further excerpts of Record 50-51 and 62-64. EPA also specifically declined to object to the permit on the grounds that the defendants raise here. That's at FER 63. As to the assertion that the regulated entities did not have notice of the extent of regulation of the permit, that is false. It's demonstrably false. SSA's own counsel commented on the draft permit, stating that the language and the definition suggested that the exclusionary language is incorporated or that the WRF may not be regulated, essentially. Ecology specifically took that assertion and said that's inaccurate, and that's at 4 ER 735-36. That comment and the response rejecting that comment are incorporated into the permit fact sheet that's issued to the public, to all of the regulated entities, with the final permit, and therefore all of the regulated entities had notice, had an opportunity to appeal, did not take that opportunity. So it's a collateral attack, and I would point the court also to the case law prohibiting such collateral attacks, which is General Motors v. EPA. It's a D.C. Circuit opinion from 1999. I also need to correct SSA's assertions that Soundkeeper got everything it wanted in this suit. This case is very much about ongoing violations and the need for injunctive relief. Even if that's the case, I think their complaint, of course, is that it was too anticipatory and there'd been no basis for it and they weren't yet even in place. So how do you respond to that? Right, so again, there is nothing in the statute, the regulations to prohibit anticipatory notice as a per se matter, and the district court, in fact, recognized that anticipatory notice can further the purpose of the notice requirement. And again, here on the facts of this case, SSA was operating on the site with the notice, operating on the site with an opportunity to make corrections for nearly eight months. So there's nothing in the case law, there's nothing in the statute, there's nothing in the regulation, and there's nothing in the policy that would support finding this letter to be too anticipatory. Instead, what the district court actually held was that Soundkeeper gave SSA too much notice, too much advanced notice. Under the district court's interpretation, Soundkeeper could have waited longer and then sued sooner, and that would have been adequate, and that does not serve the notice letter's purpose whatsoever. Counsel, can I just ask, counsel for SSA indicated that on October 23, 2017, the equipment was installed. Are you contending that it was ineffective or there were discharges relating to that after that? The treatment system, Your Honor, I think that that's just a misstatement completely of the record. The treatment system was not installed until mid-2019. The treatment system was completed June 13, 2019. That's at 1 ER 32. But even after that, the exceedances and the violations that we contend continued,  this facility exceeded the copper benchmark by more than three times, exceeded the copper benchmark at all three outfalls, and this discharge, as our expert has explained, more than seven times the acute water quality criteria that's designed to protect salmon and other aquatic species. Is your contention this is a fault of the treatment itself, the treatment facility, whatever it was? The treatment system is inadequate to prevent violations. There have been many benchmark exceedances since it was installed. Is that the treatment system that was approved by EPA and by the state? EPA had no role in it, Your Honor. How about the state? The state required an engineering report. The state said that the engineering report was appropriate and it looked like it would prevent future benchmark exceedances. The state critically never made a finding that the treatment system would comply with the permit. In fact, the ecology approval of the plan expressly disavows any such finding of compliance and says that it does not relieve the entity from complying with the water quality standards, with the treatment requirements, and it does not affect the permit. I see that I'm out of time. Could I ask you, Mr. Jones mentioned 123.1, which I think was in the amicus briefs. It does seem to draw a distinction between stricter standards for things that are covered and then expanding coverage to things that aren't covered at all in terms of the enforceability of the conditions. What's your answer to that? Again, this has never been applied in the NPDES permit context as far as I am aware of. The example that that regulation gives of something that would expand the scope is something that is outside of the NPDES universe altogether. Discharges that are subject to the NPDES permit program are discharges to surface waters. The example that EPA gives is discharges to a treatment plant, another treatment plant, publicly owned treatment plant. Those are an entirely different category of discharges, whereas here, and in keeping with the case law interpreting the scope regulations under other statutes, other environmental statutes, we have here a facility that is already regulated and required to have an NPDES permit pursuant to federal law, and there's no dispute about that. The state's permit adds requirements to sample to apply stricter pollution controls. within that facility that is already within the scope of the federal NPDES program, and moreover, Ecology made this requirement pursuant to its residual designation authority under – that's the federal authority. So it federalizes that requirement no matter what, and it's pursuant to the Clean Water Act Section 402P2E, and that's what Ecology's amicus brief and declaration explain that is why they impose these requirements on transportation facilities, because their discharges contribute to violations of state water quality standards, and so that's effectively federalized. So there are two separate independent bases for finding that these requirements are enforceable in a federal citizen suit. Thank you. Thank you, counsel. Thank both – all three counsel for their helpful arguments in this case, and the case is submitted.
judges: O'SCANNLAIN, McKEOWN, MILLER